The next case on the calendar is Jackson v. Colvin. Thanks. Thanks. Where it may please the court, my name is Tim Hiller. I'm here to argue on behalf of Christina Jackson. This is a case in which Ms. Jackson, a mentally and cognitively impaired individual who cannot understand the administrative proceedings, appeared at a hearing without a representative. At the time of the hearing, there were no medical records since July of 2012, and the hearing was in May of 2013, so it was clear that quite a bit of development had to be done at the time of the hearing. Ms. Jackson brought with her a stack of records and stated on the record that she was not sure if she had brought everything. She said, this is my first time doing this. The judge assured Ms. Jackson that she would get all the relevant medical and non-medical records. Not only did the judge do nothing other than accept Jackson's records into evidence, but a review of the record indicates that the medical and non-medical evidence was seriously incomplete in this case. So our position is, given the ALJ's heightened duty to develop the record, particularly with a claimant like Jackson who's suffering from cognitive and mental impairments and who was led by the ALJ to believe that some sort of development effort would be undertaken on her behalf. She was represented before the Appeals Council. Am I right about that? She did obtain representation before the Appeals Council. That's correct. And there were additional documents submitted there? There were additional documents submitted at the Appeals Council. That's correct. Does Your Honor have any further question about that? No. So our position is that the ALJ did not adhere to that heightened duty to develop the record. And I would note on that point that the commissioner concedes that a claimant does not have a duty to cure an ALJ's failure to develop the hearing record at the Appeals Council. They conceded that in their brief. So the commissioner advances, I would say, two main responses to our argument. The first is that we're simply speculating that there's missing evidence. And I would just call that argument cynical. In my brief, I outlined at length from seven different sources exactly why we believe that there's missing records. I put that, because I'm a visual learner, I put that in my reply brief in a chart. And I don't believe you can look at that and say that there's not records missing. In fact, the commissioner doesn't really specifically allege that any of the records we state are missing aren't missing. Instead, they just kind of vaguely say we're being speculative. And a big part of that allegation of speculation is unfortunately based on a misrepresentation of the record. The commissioner at three points in its brief says that the way that Jackson's Evelyn Brandon records were submitted into the evidence is that they weren't handed over by Jackson, but they were faxed by Jackson's therapist to the agency. Now, if that were true, I think that would make a difference. Because if I'm a judge and I'm receiving evidence from someone's therapist, I think it's reasonable to assume that I am receiving, if not all the records, at least most of the important records. But that's not true. And the commissioner has been on notice for many months now that there's no good faith basis to assert that these records were faxed by Ms. Hilt to the agency. It's very clear from the hearing transcript that Jackson herself submitted them. And I hope that the commissioner will concede that point and correct the record in their remarks. So it's clear that we have an incomplete medical and non-medical record. The commissioner's next argument is that, well, even if there was an incomplete medical and non-medical record, well, it's not clear that this would have changed the result. And here, too, Jackson strongly disagrees. These records from these seven different sources treated Jackson for her mental impairments during the relevant period. No case cited by the commissioner, and no case that I'm aware of, says that records from seven different sources that the ALJ failed to inquire into, related to a claimant's primary disability, can assume to be harmless. And under the Bushy case, all claimant has to do is show that the records could change the analysis. And so given the sheer amount of records that are missing, given that they relate to her primary disability, I think we've clearly met that burden with regards to the missing medical evidence. And then there's also the non-medical evidence. We submitted, as Your Honor noted, we submitted educational records to the Appeals Council. Included in those educational records were IQ scores that were previously unavailable to the ALJ. Those IQ scores showed that Jackson had an IQ of 73 to 74, at least her verbal IQ. The listing level for intellectual disability is 70, so that's very close. That was an IQ score from many years before. Right, so this was her premorbid IQ. And then towards the end of the relevant period, we have evidence that Jackson is developing what appear to be acute and emergent cognitive issues. She's missing buses. She's showing up to her doctor's appointment at the wrong time. Dr. Reddy says she seems to be having cognitive issues. She seems to be having memory issues. Part of your argument is that at that point it's incumbent on the ALJ to direct that a current IQ test be obtained. Am I right about that? Well, I think our argument is first the ALJ should have obtained these IQ scores. Right, which didn't come in until the Appeals Council. Right. I'm always puzzled by how this works, right? I mean, there's a kind of catch-22 for you that you can say, see, the ALJ should have gotten it, but now we've got it and we give it to the Appeals Council and they say it doesn't make a difference. Right. So, I mean, I realize it's not incumbent on you to correct, but having brought the records to the Appeals Council's attention and the Appeals Council having considered them, is there still anything left to the argument that the ALJ should have gotten these records? Other than that, really what the ALJ should have done and what the Appeals Council should have done is ordered supplementary testing given the confluence of a very low IQ in middle school or high school, whenever these were done, and evidence of deteriorating cognitive capacities as an adult. I think that you're essentially correct, Your Honor. I think that, you know, the Appeals Council, and I see that I'm over time. I'll just finish my response to this question. The Appeals Council did consider the evidence and implicitly found that it was not new and material. This court and any reviewing court can review that decision and disagree with the Appeals Council because it is preserved in the record for judicial review. And certainly our position is that it is new and material in light of the argument that I just made. But even if you disagreed with that and said, well, the Appeals Council was correct, Jackson was still prejudiced by not having this available at the hearing for the exact reason that you said. It would have triggered a further duty to obtain an updated consultative examination, particularly because we now know that her therapist called into question her ability to perform simple tasks in the statement that was submitted to the district court. And the only examining opinion of record from the relevant period was Dr. Ransom's consultative examination, which said that she would have moderate limitations for performing simple tasks. So the ALJ was on very thin ice with regards to his finding that she could perform simple work in the first place, relying only on a non-medical opinion and her own lay assumptions about Jackson. A non-treating physician opinion. There was no treating physician opinion. Could I just ask if you could point out in the brief that the ALJ misconstrued the meaning of Dr. Reddy's comment, rule out cognitive disorder, and the government's contention is yes, but that that was harmless. Could you address that point? Yes. I do not believe that it's harmless. And how do we know that? I don't believe that it's harmless because, again, our contention is that there should have been further development of her intellectual capabilities. It shows that the ALJ misconstrued the evidence at the end of the period where Jackson was having these emergent cognitive symptoms, where Dr. Reddy noted that she seemed to be having medical or memory problems, that she seemed to be having cognitive issues. If you're the ALJ and you really believe that that means he's ruled out a cognitive impairment, why would you develop the record any further? The treating physician has ruled it out. If the ALJ had properly understood that, I think it opens the door to how significant those later records are that show that she is developing some serious issues, and it really undermines the ALJ's assertion that the record doesn't point to anything that shows a decline in her cognitive abilities from the time that she was working as a nurse. The ALJ relied on that and said, well, she worked as a nurse, and nothing points to any cognitive decline since then. I think that the rule-out diagnosis really speaks to that because he totally misconstrued that. Thank you. May it please the Court, Daniella Colenso for the Commissioner. I think it's important here to clarify what the ALJ's duty was in this case. Because of Jackson's pro se status, that Jackson had a heightened duty, it was simply to adequately protect a pro se claimant's rights by ensuring sufficient development of all the relevant facts and by scrupulously, conscientiously probing into, inquiring of, and exploring of all of the relevant facts. The ALJ did that. Jackson reported to the administration at both the hearing level and earlier that she received treatment at Evelyn Brandon from Counselor Chiapone and from Dr. Reddy. She reported primary care physician treatment from Dr. Nerona. At the hearing, she reported social worker treatment with social worker Santilli from Unity Pros, where she had very recently started treatment. She reported a history of learning disability. And what the ALJ possessed was a complete medical history from all of those treating sources. Jackson has not identified that any of these sources were overlooked in the record. And what else is important to... Mr. Hilliard just said that the most recent records were about a year old. No. What he's saying is that the records at the time of the hearing were about a year old. And this goes also to Jackson's point about the HILT facts. At the hearing, Jackson submitted a volume of records, and in that was 37 pages faxed from Counselor HILT. It made it to the agency. The cover letter identifies 37 pages. The subsequent 36 pages in the record, there's a facts header. It shows that each of the 37 pages did make it to the agency. It covers a period of February 2012 through March 2013. I'm sorry, July 2012 through March 2013. There's no indication in that record that any treatment is missing. It includes a record of treatment from Counselor HILT, as well as Dr. Reddy and Counselor Prince. The ALJ was reasonable to believe that this evidence was complete, and it represented her treatment during that period. And what I should also remind is that what's important is that the ALJ bases his decision on a review of the complete medical history and that there are no obvious gaps. It doesn't matter if before the hearing there's a lack of development, so long as the ALJ did ensure that that development was complete at the time of writing the decision, and here the ALJ did. And as to IQ scores, the record doesn't demonstrate a cognitive decline. In Jackson's opening brief and in her reply brief, she repeats that Dr. Reddy opined that there was cognitive and memory decline because of drug use. In fact, Dr. Reddy merely reported Jackson's own reports that she had memory and cognitive decline because of drug use. He observed on that occasion that Jackson appeared to be having cognitive impairment. But the ALJ bases his decision on evidence of her learning disability, evidence of her ability to nonetheless work as a CNA for 10 years. She worked rather incompetently as a nursing aide, right? I mean, isn't the record that she eventually gets fired because she can't do the job? Well, no, she testified that she was sleeping on the job. She also testified she was fired because she could not switch her shift so she could care for her mentally ill son, which is evidence, this court has ruled, of ability to perform work functions. She testified she has a disabled son that requires a lot of care. She also testifies that she was forgetting assignments and failing to do things and spending a lot of time sitting in the office of a very accommodating boss weeping. That doesn't sound like a competent performance to me. She also testified, and throughout the record there's evidence, that she was using drugs while working, that she was drinking on the job. But that's not evidence. Why is there not? Well, but if you have someone who, if the educational records had been obtained, would be known to have a borderline IQ before she starts this process, who then engages in drug and alcohol use that her primary physician has concerns about what her cognitive capacities might be, why is it not incumbent to try to find out what those cognitive capacities are? Particularly, is there not a problem that the ALJ thought that the doctor had ruled out cognitive problems when in fact the doctor was doing essentially the opposite, saying I noticed these cognitive issues and we need to rule that out, we need to work on that. And the record doesn't show a definitive diagnosis, this was converted to a definitive diagnosis. It also doesn't show a doctor already ordered or felt the need to order IQ testing. What's your contention that after that notation about rule out cognitive disorder, that we have a sufficiently complete file from Dr. Reddy, that there's no worry that there's some missing document where he did further examination of that subject? Well, Jackson testified at the hearing that she had stopped seeing Dr. Reddy at the completion of her chemical dependency treatment. There's no actual evidence that there are missing records or that they would be cumulative. She didn't testify that there was IQ testing done. So if there's no IQ, but this seems to me a sort of circular thing. You're saying, well, since we know we have the complete record from Dr. Reddy, let's assume that for the moment, that he didn't order any further IQ testing, she drops out of treatment. But where we're left is that the doctor was concerned about the need to rule out cognitive problems. And now the ALJ is in a position to get a consultative expert in and find out and do that ruling out. You're saying because we have all the records from Reddy, so we don't need to do anything further? Well, Your Honor, the ALJ did consider the impact of cognitive impairment on her functioning. He looked at education records. He found she was not capable of performing that work as a semi-skilled CNA, and he accommodated all limitations of the records. So on the basis of what? If it's found that she no longer could do the work that she had done, which is sort of the basis for saying her cognitive impairments aren't that great, but she can't do that anymore, on what basis do we think she has the cognitive ability to do something else? A review of her mental status examination findings, her own reports of activities of daily living, her ability to care for her son, to get out of the house with her neighbor. She's able to, she said at the hearing, attend all of her groups. Her ability to care for her son includes serving peanut butter sandwiches for dinner for days on end because she's not able to get up the energy to go get groceries or do any cooking. She also takes him to daycare when she tends her own appointments. She takes him to the museum and the park so that he can live a normal life, she says. She's independently caring for a mentally ill son, which this court has said is significant evidence that undermines subjective complaints of inability to work. And the ALJ considered that along with the evidence of her learning disability and her cognitive impairment as measured by Dr. Reddy and other treating sources. There was no gap in the record as far as IQ testing goes. Is there any opinion from a treating physician that says she can work? There is not in the records. And neither is there an opinion from a treating physician that says she can't work, right? There's neither, and the record didn't require a treating source. This court has made clear that the record development is not needed even when there's no treating source opinion where the record is complete and where there are no obvious gaps. And very recently in Monroe they said that where there's evidence of function of past work, of current functioning, and of activities of daily living, which we have in front of the ALJ. Why is there not a need to have further examination by the District Court of the Tiredo factors in connection with, is it DeMarco, the social worker's opinion? Well, to begin, Judge Saragusa specifically made a finding that this evidence did not trigger remand under 405G, and therefore we can presume that he did go through the factors. He also based that finding on supplemental briefing from both parties. The commissioner submitted an initial letter motion explaining to him his requirements under 405G. Jackson was permitted an opening supplemental brief. We replied, and I should note that Jackson in her supplemental briefing never actually argued that there was good cause for failure to submit this evidence earlier. Therefore, this has been waived, and quite frankly, she hasn't met her burden to show that this evidence should be reviewed. And this court in Tiredo was specifically concerned with an unending lack of finality of the administrative judicial process if plaintiffs were allowed to continue to submit new evidence. And this evidence was dated more than two and a half years after the close of the administrative process. It's provided by a social worker who did not give treatment to Jackson during the relevant period. There's no indication she reviewed records of treatment during the relevant period. And therefore, it's very immaterial. And just, I think, alone, the district court's specific ruling on this is sufficient, and there doesn't need to be further examination of the evidence, which is clearly immaterial. Thank you, Your Honor. Thank you. So with regards to Jackson's child care, and specifically the Monroe case that the commissioner mentioned, in that case, the claimant was snowmobiling, went on multiple cruises during the relevant period, and was horseback riding. To compare that to just having a child, again, I put that in my letter and I believe it. I think that's misguided and offensive. I think Jackson's status as a single mother is not comparable to those activities which are indicative of a fraudulent disability claim. Regarding her child care, they mentioned that, well, she took her child to daycare. Daycare was down the street from her house. That's record 56. She testified that her neighbor helped cook for her son and helped care for her son. That's record 212 and 214. She testified that she was having a hard time keeping up her home because her son could be very overwhelming. Record 58. She said she was challenged to deal with her son at times. Record 64. The point is the record is replete with instances that she was having a lot of difficulty caring for her son. And so I don't think it shows that she's capable of simple work. And with regards to the commissioner's statement that there's a complete treatment history from Dr. Reddy, that is not correct in my opinion. Jackson testified at her hearing that she had seen Dr. Reddy a couple weeks ago. The hearing was held in May of, I believe it was May 17th, 2013. The last treatment that we have from Dr. Reddy is in March. So clearly there were other records from Dr. Reddy. Given what the PROSE program is, it's basically a life skills program. It's very possible that there may have been an IQ score requested there. And the mere fact that Dr. Reddy didn't request an IQ score, I mean, maybe they don't do that at that institution. Maybe it's just not something that's available at that institution. I believe that given the pre-morbid IQ scores, which the ALJ should have obtained, given his complete misunderstanding of the rule out diagnosis, and given that Dr. Reddy clearly endorsed the fact that Jackson was having these kind of acute cognitive issues. It was incumbent for further development, and we request a remand to the district court for that purpose. Thank you. Thank you both. Well argued, very helpful.